UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| MARNITA GODDARD, | ) | CIV. 09-5069 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | **AS TO DEFENDANT SDPAA'S** |
| CITY OF DEADWOOD and | ) | **MOTION FOR SUMMARY** |
| SOUTH DAKOTA PUBLIC | ) | **JUDGMENT [DOCKET NO. 41] &** |
| ASSURANCE ALLIANCE, | ) | **PLAINTIFF'S MOTION FOR** |
| | ) | **PARTIAL SUMMARY JUDGMENT** |
| Defendants. | ) | **[DOCKET NO. 56]** |
| | ) | |
| | ) | |

**INTRODUCTION**

This matter is before the court on plaintiff Marnita Goddard's personal injury action against the South Dakota Public Assurance Alliance ("SDPAA"), the insurance coverage provider for the City of Deadwood, South Dakota.[1]  See Docket Nos. 1, 26.  Jurisdiction is premised on the complete diversity of citizenship of the parties and an amount in controversy which exceeds $75,000.  See 28 U.S.C. § 1332.

_____

[1] Ms. Goddard initially brought suit against the City of Deadwood alone, but was subsequently granted leave to amend her complaint to add her claim against SDPAA.  See Docket No. 22. Ms. Goddard has now settled her claim against the City of Deadwood.  See Docket No. 70.  The district court has granted the City's unopposed motion to dismiss the complaint against the City of Deadwood.  Docket No. 72.  SDPAA has maintained its cross-claim against the City.  See Docket No. 31.

On November 22, 2010, SDPAA moved for summary judgment in its favor on all of the claims in Ms. Goddard's second corrected amended complaint (Docket No. 26), specifically the claim that SDPAA is responsible for her damages in the event an alleged unidentified driver is ultimately found to be the proximate cause of the accident.  See Docket No. 41.  Ms. Goddard resists SDPAA's motion for summary judgment.  See Docket No. 50.

On January 31, 2011, Ms. Goddard moved for partial summary judgment in her favor on two issues:  first, that she is not liable for the accident on a theory of either assumption of the risk or contributory negligence; and second, that she was in fact injured as a result of the accident.  See Docket No. 56.  SDPAA resists Ms. Goddard's motion.  See Docket No. 61.

On April 7, 2011, the district court, the Honorable Jeffrey L. Viken, referred SDPAA's motion for summary judgment and Ms. Goddard's motion for partial summary judgment to this magistrate court for a report and recommendation for resolution, pursuant to 28 U.S.C. § 636(b)(1)(B).  See Docket No. 69.

## FACTS

### A.   UNDISPUTED MATERIAL FACTS

On August 25, 2007, Ms. Goddard was a passenger in a vehicle operated by the defendant City of Deadwood through its business, known as the Deadwood Trolley ("Trolley").  Docket No. 1, ¶5.  Jerry Boub, an employee of the

City, had started his shift as a Trolley driver shortly before 11:23 p.m. on that date.  Docket No. 47, Affidavit of Thomas E. Brady ("Aff. of T. Brady"), at ¶ 2; Docket No. 47-1, Deposition of Jerry A. Boub ("Boub Deposition"), at 12:6-9. On that evening, Mr. Boub's Trolley was full of passengers, including Ms. Goddard.  Docket No. 47-1, Boub Deposition, 49:4-6.  As his shift began, Mr. Boub boarded his assigned Trolley at the bus barn located behind Deadwood's rodeo grounds and football field.  Docket No. 47-1, Boub Deposition, 44:6-18.

Mr. Boub drove the Trolley away from the Trolley barn, heading east for a brief distance before turning left onto Rodeo Street.  Docket No. 47, Aff. of T. Brady, ¶ 3; Docket No. 47-3, Deposition of Trooper Derek Mann ("Mann Deposition"), at 11:20-13:2.  Rodeo Street is located between the Deadwood rodeo grounds, which lay to the left of the Trolley's route on the evening of August 25, 2007, and the football field, which lay to the right of the Trolley's route on that evening.  Docket No. 47, Aff. of T. Brady, ¶2; Docket No. 47-1, Boub Deposition, 68:3-17; Docket No. 47-3, Mann Deposition, 11:22-14:2. Between the football field and Rodeo Street is an area for perpendicular parking, designated by painted yellow lines.  Docket No. 47, Aff. of T. Brady, ¶2; Docket No. 47-1, Boub Deposition, 70:14-16; Docket No. 46-1, Collision Analysis by Martin R. Goetsch ("Goetsch Report"), at p. 9.  A single light post stands where one of the perpendicular parking spots meets the edge of Rodeo

3

Street.  Docket No. 47, Aff. of T. Brady, ¶2; Docket No. 47-1, Boub Deposition, 70:14-16, 79:23-80:1; Docket No. 46-1, Goetsch Report, at pp. 6, 8.

As Mr. Boub turned left onto Rodeo Street, he saw a car parked in the driving lane in which the Trolley was traveling.  Docket No. 47, Aff. of T. Brady, ¶2; Docket No. 47-1, Boub Deposition, 88:4-21.  Mr. Boub completed his turn onto Rodeo Street, then drove the Trolley into the unoccupied parking spaces to the right of the improperly parked car and the light post, in order to avoid colliding with the car parked in the driving lane.  Docket No. 47, Aff. of T. Brady,¶2; Docket No. 47-1, Boub Deposition, 70:14-20, 73:19-21, 74:10-12, 84:21-22, 86:6-11, 88:4-18, 89:23-90:1, 129:12-14.  Mr. Boub claims that while he drove in the unoccupied parking spaces, he saw a glare on his windshield.  Docket No. 47-1, Boub Deposition, 79:13-18.  Upon seeing the glare, Mr. Boub pulled the Trolley to the right, and drove it off a three-foot eight-inch ledge onto the football field below.  Docket No. 47, Aff. of T. Brady, ¶2; Docket No. 47-1, Boub Deposition, 69-70.

On the same evening, August 25, 2007, Joann Hull was employed as a card dealer at the Cadillac Jack's gaming establishment in Deadwood, South Dakota.  Docket No. 45, Affidavit of Joann Hull ("Aff. of J. Hull"), at ¶2. Ms. Hull's shift ended during the early morning hours of August 26, 2007.  Id. at ¶2.  Prior to her shift, Ms. Hull had parked her 2001 Subaru into the second parking spot along the west side of the football field adjacent to Rodeo Street.

4

Id. at ¶4.  When Ms. Hull's shift ended, she walked from Cadillac Jack's to her parking spot and saw that the Trolley had driven off the ledge abutting the football field and remained partially off the ledge, with the rear of the vehicle still extended into the air.  Id. at ¶5.

Prior to the accident, Mr. Boub had been driving the Trolley in a northerly direction in the unoccupied parking spaces between the light post and the football field, directly toward and perpendicular to Ms. Hull's properly parked car.  Docket No. 46-1, Goetsch Report, at p. 9.

Ms. Goddard claims that as a result of the accident, she sustained physical injuries.  Docket No. 44, Affidavit of Ron Burmood ("Aff. of R. Burmood"), ¶3.  She initially filed suit against the City alone, but later moved the court for permission to amend her complaint to include a claim against SDPAA, after Mr. Boub's deposition testimony indicated that an unidentified vehicle traveling toward the Trolley may have caused him to drive the Trolley off the ledge.  See Docket No. 14.  Based on Mr. Boub's testimony, and Ms. Goddard's assertion that she is a "member" under the policy, Ms. Goddard asserts that she may recover under the uninsured motorist provision, in the event a jury determines that a unidentified driver caused the accident.  Id. at ¶5; see Docket No. 26.  On July 2, 2010, the district court permitted

5

Ms. Goddard to amend her complaint to reflect the addition of SDPAA as a

party defendant.[2]  See Docket No. 22.

**B.      DISPUTED MATERIAL FACTS**

The parties dispute whether Mr. Boub actually saw an oncoming vehicle

directly in front of the Trolley before he drove it off the ledge, or whether he

merely saw lights or a glare through his windshield.  SDPAA argues that

Mr. Boub saw the latter, and not the former.  See Docket No. 47, Aff. of T.

Brady, at ¶2; Docket No. 47-1, Boub Deposition, 79:13-18.  Ms. Goddard

asserts that Mr. Boub's testimony repeatedly indicates that he drove off the

ledge to avoid an imminent collision with an oncoming vehicle.  Docket No. 47-

1, Boub Deposition, and Docket No. 65-1 (additional excerpts of Boub

Deposition), 79:9-10, 79:13-18, 80:5-7, 80:21-23, 81:5-8, 82:15-21, 85:1-8,

90:2-7, 92:12-13, 93:17-22, 102:13-19, 103:7-10, 105:12-13, 106:23-25,

107:8-12.  Ms. Goddard asserts that these excerpts demonstrate "absolute

---

[2] Without deciding whether Goddard qualifies as a "member" under the SDPAA policy, the district court explained that if Ms. Goddard is eventually determined to be an insured, and therefore entitled to uninsured motorist coverage under the policy, she could properly proceed on her claim in any one of three ways: (1) by filing a direct action against the insurer without joining the uninsured motorist as a party defendant; (2) by filing an action joining both the insurer and the uninsured motorist as party defendants; or (3) by filing an action against the uninsured motorist alone, without joining the insurer as a party defendant.  See Docket No. 22, at pp. 3-4 (quoting Baker v. Continental Western Insurance Company, 748 F. Supp. 716, 722 (D.S.D. 1990); and S.D.C.L. § 58-11-9).

testimony" that an oncoming vehicle caused Mr. Boub to drive the Trolley off the road.  Docket No. 50, at p. 4.

The parties also dispute whether a vehicle traveling directly toward the Trolley would necessarily have been traveling in the driving lane of Rodeo Street, or whether an oncoming vehicle could have fit between Ms. Hull's parked vehicle and the Trolley.  SDPAA asserts that any oncoming vehicle must have been traveling in the southbound lane of Rodeo Street, rather than directly toward the Trolley in the unoccupied parking spaces to the right of the light pole and directly south of Ms. Hull's parked vehicle.  Docket No. 47, Aff. of T. Brady, at ¶2; Docket No. 47-3; Mann Deposition, 94:1-95:25.  Ms. Goddard states that there was sufficient space between Ms. Hull's vehicle and the Trolley for an oncoming vehicle to be driving head-on toward the Trolley before the Trolley drove off the ledge.  Docket No. 53, Response to SDPAA's Statement of Material Facts, ¶23 (citing Docket No. 47-1, Boub Deposition, 81:5-7).

SDPAA's statement of undisputed material facts does not address the specific language contained in the SDPAA policy.  See Docket No. 42.  SDPAA's brief in support of summary judgment argues that Ms. Goddard may not recover under the uninsured motorist provision, since she was simultaneously attempting to recover from the City under the liability coverage provision, and the policy specifically prohibits this type of duplicative recovery.  Docket No. 43, at p. 3.

Ms. Goddard asserts that her dual claims under the SDPAA policy are not duplicative, in that she asserted two separate claims against two separate defendants, and only one of those claims involves recovery under the uninsured motorist provision. See Docket No. 50, at p. 7. She asserts that her claim for damages under the liability provision of the SDPAA policy stemmed from her negligence claim against the City, with Mr. Boub being the insured member under the policy. Id. at p. 6. This claim has now been settled. See Docket No. 72. Ms. Goddard asserts that her entitlement to recovery under the uninsured motorist provision stems from her claim against the alleged unidentified driver, with coverage available to her as the member under the policy. Id. at p. 7. Ms. Goddard's claim against SDPAA remains pending.

## DISCUSSION

### A.   SUMMARY JUDGMENT STANDARD

Under Rule 56(c) of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." In determining whether summary judgment should issue, the court views the facts, and inferences from those facts, in the light most favorable to the nonmoving party. See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986). The burden is placed on the moving party

8

to establish both the absence of any genuine issue of material fact and that the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).

Once the movant has met its burden, the nonmoving party may not simply rest on the allegations in the pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact and properly address the opposing party's assertions of fact, as required by Rule 56(c)).[3]  In determining whether a genuine issue of material fact exists, the court views the evidence presented in light of which party has the burden of proof under the underlying substantive law.  Id.  Summary judgment will not lie if there is a genuine dispute as to a material fact, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

The substantive law identifies which facts are "material" for purposes of a motion for summary judgment.  Anderson, 477 U.S. at 247.  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  Id. at 248 (citing 10A Charles

---

[3] Rule 56(c) provides the methods by which each party must support its own assertions of fact, including "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."

Alan Wright, Arthur R. Miller, & Mary Kay Kane, FEDERAL PRACTICE AND

PROCEDURE § 2725, pp. 93-95 (1983)).  The Supreme Court has further

explained that:

> the issue of material fact required by Rule 56(c) to be present to
> entitle a party to proceed to trial is not required to be resolved
> *conclusively* in favor of the party asserting its existence; rather, all
> that is required is that sufficient evidence supporting the claimed
> factual dispute be shown to require a jury or judge to resolve the
> parties' differing versions of the truth at trial.

Anderson, 477 U.S. at 249-49 (quoting First National Bank of Arizona v. Cities

Service Co., 391 U.S. 253, 288-89 (1968) (emphasis added)).  Essentially, the

availability of summary judgment turns on whether a proper jury question is

presented.  See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

"The inquiry performed is the threshold inquiry of determining whether there is

the need for a trial-whether, in other words, there are any genuine factual

issues that properly can be resolved only by a finder of fact because they may

reasonably be resolved in favor of either party."  Anderson, 477 U.S. at 250.

Even if a motion for summary judgment on a particular claim stands

unopposed, the district court must still determine that the moving party is

entitled to judgment as a matter of law on that claim.  Interstate Power Co. v.

Kansas City Power & Light Co., 992 F.2d 804 (citing Anchorage Assoc. v. Virgin

Island Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990); Stiffel, Nicolaus &

Co. v. Dain, Kalman & Quail, Inc., 578 F.2d 1256, 1263 (8th Cir. 1978)).  With

the foregoing standard in mind, the court now turns to both the defendant

10

SDPAA's motion for summary judgment (Docket No. 41), and Ms. Goddard's

motion for partial summary judgment (Docket No. 56).

**B.     SDPAA'S MOTION FOR SUMMARY JUDGMENT [DOCKET NO. 41]**

> **1.     Whether an Unidentified Vehicle Existed and Proximately
>           Caused Ms. Goddard's Injuries**

SDPAA admits that its insurance policy provides for uninsured motorist

benefits to be paid to a "member" where the member sustains injuries caused

by an uninsured automobile.  Docket No. 43, at p. 5.  However, SDPAA argues

that Ms. Goddard is not a member.  Docket No. 43, at p. 3.  In addition, SDPAA

argues that there was no unidentified vehicle directly in front of the Trolley just

prior to the time Mr. Boub drove it off the ledge.  Id.  SDPAA states that an

oncoming vehicle could not have been the proximate cause of the Trolley's

accident and Ms. Goddard's injuries, since Ms. Hull's vehicle was parked in the

Trolley's direct line of travel, and therefore the alleged unidentified vehicle, if

one existed, could only have been traveling properly in the driving lane of

Rodeo Street, where it posed no risk of harm to the Trolley.  Id. at p. 6.

In asserting a claim against SDPAA, Ms. Goddard has relied on

Mr. Boub's deposition testimony.  Ms. Goddard asserts that Mr. Boub's

testimony repeatedly indicates that he swerved to avoid an imminent head-on

collision with a car which was "right in front of" the Trolley.  Docket No. 50

(quoting Docket No. 47-1, Boub Deposition, 80:5-7, 80:21-23, 82:15-21).

Ms. Goddard cites <u>Mason v. State Farm Mutual Automobile Insurance</u> <u>Company</u>, No. 4:09-CV-1822 FRB, 2010 WL 2870667 (E.D. Mo. July 19, 2010), to support her assertion that summary judgment is not appropriate on this issue because the deposition testimony "unequivocally demonstrates the existence of a material question of fact."  Docket No. 50, at p. 3.

In the <u>Mason</u> case, the plaintiff alleged that an unidentified vehicle negligently drove into the path of the vehicle in which the plaintiff's son and daughter were passengers ("the Morris vehicle"), causing the driver to swerve and lose control of the vehicle.  <u>Mason</u>, 2010 WL 2870667, at *1.  The driver and the plaintiff's son died as a result of the accident.  The plaintiff's daughter, Kasey Landa, later testified that just prior to the crash, she observed headlights through the windshield of the Morris vehicle, but she could not definitively say where the oncoming vehicle was located prior to the crash, nor the path it was taking.  <u>Id.</u> at *2.  However, she testified that she did not recall believing at the time that the oncoming car was going to swerve into the Morris vehicle's lane.  <u>Id.</u>

Several months after her deposition testimony, Ms. Landa submitted a sworn affidavit in which she attested that the headlights she observed had pulled onto the highway from the right side of the road, in front of the Morris vehicle.  <u>Id.</u> at *3.  Following Ms. Landa's revised testimony, the defendant insurance company moved for summary judgment on grounds that the plaintiff

could not produce substantial evidence demonstrating that the driver of the unidentified vehicle acted negligently and caused the Morris vehicle to swerve. Id. at *6.  The defendant argued that Ms. Landa's affidavit should be stricken because it contradicted her earlier deposition testimony and attempted to create a "sham issue of fact" to preclude summary judgment.  Id. at *3.

The court struck Ms. Landa's affidavit because it contradicted her deposition testimony and did not sufficiently explain the contradictions.  Id. at *4 (quoting RSBA Aerospace, Inc. v. Affiliated FM Ins. Co., 49 F.3d 399, 402 (8th Cir. 1995)  ("[C]ontradictory affidavits will preclude summary judgment only if the prior testimony reflects confusion on the part of the witness and the affidavits explain why the earlier testimony is in conflict with the affidavits.")). However, the court found that even in the absence of the affidavit, there was sufficient evidence demonstrating that the Morris vehicle "made a sudden swerve . . . in response to negligent action taken by the unidentified vehicle." Id. at *6.  The court stated that "[t]he simultaneous nature of [the witness'] observation of the headlights, the excited utterance from a person in the front seat, and the sudden swerve to the left combine to create a genuine issue of material fact as to whether and to what extent any action on the part of the unidentified vehicle caused the Morris vehicle to leave the roadway."  Id.  The court found that summary judgment was therefore inappropriate, because

13

"[c]ausation is a jury question."  Id. (citing Baker v. Eckelkamp, 760 S.W.2d

178, 178 (Mo. Ct. App. 1988)).

Here, Mr. Boub's sworn testimony indicates that he saw lights or a glare

in his windshield, which he assumed at the time came from an oncoming

vehicle.  See Docket No. 47-1, Boub Deposition, and Docket No. 65-1, at

79:9-10, 79:13-18, 80:5-7, 80:21-23, 81:5-8, 82:15-21, 85:1-8, 90:2-7,

92:12-13, 93:17-22, 102:13-19, 103:7-10, 105:12-13, 106:23-25, 107:8-12.

Mr. Boub's testimony about his observations immediately prior to the accident,

accompanied by the Trolley's sudden swerve to the right, indicate that Boub

believed that a collision with an oncoming vehicle was imminent, and he

swerved to avoid a collision.  There is no subsequent affidavit or sworn

testimony in the record which contradicts Mr. Boub's deposition testimony or

otherwise indicates that Ms. Goddard is relying on a "sham issue of fact" to

avoid summary judgment.  See Mason, 2010 WL 2870667, at *3.  There is no

evidence before the court that anyone made an excited utterance regarding the

appearance of the alleged unidentified vehicle, as in the Mason case, but the

court finds that the quantum of evidence before the court is nonetheless

sufficient to preclude summary judgment on the issue of whether an

unidentified vehicle existed and proximately caused the accident.   Whether an

unidentified vehicle actually existed is a disputed fact, and is therefore not

appropriate for this court to consider, as a matter of law.  See, e.g., Christian v.

14

First Liberty Ins. Corp., No. 1:10-CV-125, 2011 WL 949754, at *3 (M.D. Pa. Mar. 16, 2011) (existence and identity of the alleged unidentified motorist is a question of fact for the jury where the tortious driver's identity is not known and where there is a question as to whether the driver actually existed).

Moreover, if an unidentified vehicle did exist, whether its driver acted negligently and thereby caused the Trolley's accident is also not appropriate for this court to decide on a motion for summary judgment.  Issues of negligence, foreseeable risk, and proximate cause are generally questions of fact for the jury.  Lather v. Beadle County, 879 F.2d 365, 368 (8th Cir. 1989) (citing Williams v. Chick, 373 F.2d 330, 332 (8th Cir. 1967)).  Viewing the evidence in the light most favorable to Ms. Goddard, and drawing all reasonable inferences in her favor, there remain genuine issues of material fact as to whether an unidentified vehicle existed, and if it did exist, whether it was the proximate cause of the Trolley's accident and Ms. Goddard's injuries.  Disputed factual issues such as these are appropriate for the jury's consideration.  Therefore, the court recommends that SDPAA's motion for summary judgment as to whether an unidentified vehicle existed and proximately caused the Trolley accident be denied.

### 2.    Whether Ms. Goddard is a "Member" Under the Policy

The parties agree that South Dakota state law controls this court's interpretation of SDPAA's insurance policy.  However, the parties disagree as to

whether Ms. Goddard is an insured member under the policy, and each party asserts that the contract clearly and unambiguously supports their respective positions on this issue.  Section II, entitled "Who Receives Coverages," is the pertinent section of the policy, upon which both parties rely in support of their argument regarding Ms. Goddard's eligibility for membership.  Section II reads, in its entirety:

Member means:

A.  you, including your governing body, Boards, Commissions, or Councils;

B.  while acting on your behalf or in your interest, any past, present or future:

    1.     member of your governing body, Boards, Commissions, or Councils;
    2.     elected or appointed official;
    3.     employee acting within the scope of their employment;
    4.     volunteer or student performing a service for you at your request;
    5.     volunteer fire company, volunteer ambulance service or other volunteer emergency services entity.

This does not include any elected or appointed official, Board, Commission or Council member, employee or volunteer with respect to any automobile owned by such person, unless acting within the scope of their duties for you;

C.    Any organization, other than a joint venture, which you acquire or form and over which you maintain ownership or majority ownership interest;

D.    Anyone else while using, with your permission, any automobile owned, hired or borrowed by you except the owner or anyone else from whom you hire or borrow such vehicle.

16

Docket No. 44-1, at p. 8.

Whether Ms. Goddard is entitled to any recovery at all from SDPAA turns on whether she can be considered a member under the policy. There appears to be no dispute that if she is not a member, she cannot invoke the uninsured motorist provision. However, the policy neither expressly includes nor excludes passengers from coverage by name, so a determination of whether Ms. Goddard is a member involves principles of contract interpretation.

When construing insurance contracts, the plain and ordinary meaning of policy language should be given effect, unless it is clear from a reading of the whole agreement that a different meaning was intended. Harms v. Northland Ford Dealers, 1999 SD 143, ¶12, 602 N.W.2d 58, 61 (internal citation omitted). "In determining the proper meaning of a contract the court must seek to ascertain and give effect to the intention of the parties." Burlington Northern, 347 F. Supp. 2d at 716 (citing Bunkers v. Jacobson, 2002 SD 135 ¶ 15, 653 N.W.2d 732, 738; and Read v. McKennan Hosp., 2000 SD 66, ¶ 23, 610 N.W.2d 782, 786)).

The meaning of undefined words may be established by looking to the ordinary dictionary definition of each word. Unambiguous language and terms must be given effect, in accordance with their plain and ordinary meaning. See Kimball Investment Land, Ltd. v. Chmela, 2000 SD 6, ¶14, 604 N.W.2d 289, 293. In all cases, the policy language should still be read in context with the

entire agreement.  See, e.g., Baum v. Helget Gas Products, Inc., 440 F.3d 1019, 1023 (8th Cir. 2006) (citing Speedie Food Mart, Inc. v. Taylor, 809 S.W.2d 126, 129 (Mo. App. 1991)).

The doctrine of *ejusdem generis* dictates that when interpreting a general word or phrase that follows or precedes a series of specific words, the court should construe the general word to encompass only items of the same type or nature as the specifically-enumerated entities.  See Nielson v. AT&T Corp., 1999 SD 99, ¶ 15, 597 N.W.2d 434, 439 (quoting In re Grievance of Wendell, 1998 SD 130, ¶ 7, 587 N.W.2d 595, 597)).  "Like many interpretive canons, however, *ejusdem generis* is a fallback, and if there are good reasons not to apply it, it is put aside."  Circuit City Stores, Inc., v. Adams, 532 U.S. 105, 138 (2001) (citing Norfolk & Western R. Co. v. Train Dispatchers, 499 U.S. 117, 129 (1991)).

Whether the language of a contract is ambiguous is a question of law. Bunkers, 2002 SD 135, ¶15, 653 N.W.2d at 738; and Pesicka v. Pesicka, 2000 SD 137, ¶6, 618 N.W.2d 725, 726.  " 'A contract is not rendered ambiguous simply because the parties do not agree on its proper construction or their intent upon executing the contract.' "  Burlington Northern & Santa Fe Ry. Corp. v. Dakota Missouri Valley R.R., Inc., 347 F. Supp. 2d 708, 716 (D.S.D. 2004) (quoting Singpiel v. Morris, 1998 SD 86, ¶16, 582 N.W.2d 715, 719 (additional citation omitted)).  An insurance contract is ambiguous only when

18

"it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." Arch v. Mid-Dakota Rural Water System, 2008 SD 122, ¶9, 759 N.W.2d 280, 282 (quoting Singpiel, 1998 SD 86, ¶16, 582 N.W.2d at 719).

If, after applying the foregoing rules of construction, a contract is found to be ambiguous, the court should apply the additional rule that ambiguous provisions are to be construed against the insurer that drafted them, and in favor of the insured for whose benefit the coverage was adopted. See, e.g., Central Nat. Ins. Co. of Omaha v. Devonshire Coverage Corp., 565 F.2d 490, 497 (8th Cir. 1977) ("As a general rule an ambiguous clause is construed most strongly against the drafter, especially when the contract is one between an insurance company and its insured."). Under South Dakota law, ambiguous provisions are to be read in the context of the entire insurance policy. See, e.g., Prokop v. North Star Mut. Ins. Co., 457 N.W.2d 862, 864 (S.D. 1990). With the foregoing contract interpretation guidelines in mind, the court now turns to the parties' substantive arguments as to whether Ms. Goddard can be considered a member under the SDPAA policy.

SDPAA contends that the policy definition of "member," when it is considered in the context of the full insurance agreement, clearly and unambiguously indicates that passengers were not intended to be members.

Docket No. 43, at p. 9 (citing <u>Dubinsky v. Mermart, LLC</u>, 595 F.3d 812, 816 (8th Cir. 2010)).  To illustrate the importance of considering the entire agreement, SDPAA directs the court to Section III(K), which describes the coverage available to members for injuries caused by an automobile.  Docket No. 43, at p. 11.  Specifically, Section III(K) covers medical expenses for

> (1) a member who sustains injury caused by an occurrence while in, on, getting into or out of an automobile; (2) a member, while a pedestrian, when struck by an automobile; or (3) <u>anyone else</u> who sustains injury caused by an occurrence arising out of your covered operations while in, on, getting into or out of an automobile.

Docket No. 44-1, at p. 10-11 (emphasis added).  SDPAA argues that if the intention under the policy was for passengers to be considered members, then the language in Section III(K)(1) would sufficiently provide coverage for passengers' medical expenses, and subsection (3) would be rendered unnecessary.  Docket No. 43, at p. 12.  SDPAA also argues that a comparison of the language in Sections III(K) and III(R) indicates that if the policy had been intended to insure passengers, then Section III(R), the uninsured motorist provision, would have included the same broad "anyone else" language that is contained in Section III(K)(3).  <u>Id.</u>  Section III(R) contains no such language.[4]

_____

[4]Section R provides, in part:

> We will pay those amounts that a member is legally entitled to recover as damages from the owner or operator of an uninsured automobile or underinsured automobile.  The damages must result from injury sustained by the member and caused by an occurrence resulting from the ownership, maintenance or use of, or when struck

SDPAA asserts that the policy definition of "claim" and the liability coverage provision at Section III(J) further indicate that passengers were not intended to be included as members.  Docket No. 43, at p. 13.  The policy defines a claim as a "formal demand received by the member for money or services, including the service of suit or institution of arbitration proceedings against the member."  Docket No. 44-1, at p. 4.  Section III(J) describes the limits the policy will pay for all damages for "all *injury* in any one accident arising out of the ownership, maintenance or use of an automobile owned by *you* . . . ."  Id. at p. 10 (emphasis in original).  SDPAA argues that because Ms. Goddard is the claimant, she cannot also be the member, because the policy expressly contemplates that members would be those persons or entities which are <u>subjected</u> to claims under the liability provision, not those which are asserting claims <u>against</u> members.  Docket No. 43, at p. 14.

Finally, SDPAA suggests that the policy clearly and unambiguously indicates that only "a specific type of person or entity is intended to be a

---

by, an uninsured automobile or underinsured automobile.  Use includes operating the vehicle as well as getting into or out of, of being in or on the vehicle.
. . .
The right to coverages and the amount payable will be decided by agreement between the member and the Pool.  If an agreement cannot be reached, the decision will be made as described in ARBITRATION in SECTION VII - CONDITIONS. . . .

Docket No. 44-1, at p. 13.

member," and that passengers constitute a different class of persons than those persons or entities which were intended to be covered, such as persons acting on behalf of or for the benefit of the City.  Docket No. 43, at p. 10. SDPAA asserts that the court must apply the doctrine of *ejusdem generis* to the policy language and construe the class of persons named in Section II(D) as belonging to the same general class as that specifically enumerated in subsections II(A) through II(C).[5]  Id. at p. 10-11.

Ms. Goddard suggests that the issue of whether she is a member under the policy has already been decided by the Fourth Judicial Circuit, Lawrence County, South Dakota, and that as a result, SDPAA is collaterally estopped from asserting in this proceeding that she is not a member.  See Docket No. 50, at p. 8-9.  She argues that she is a member under Section II(D), since she qualifies as "anyone else" who permissibly used an automobile owned by the City.  Docket No. 50, at 9-10.  Ms. Goddard further asserts that since she qualifies as a member under subsection II(D), she need not fulfill the requirement under subsection II(B) that she was acting on behalf of or in the interest of the City of Deadwood, as SDPAA contends she must.  Even if she is

---

[5]According to SDPAA, only those individuals or entities which are not otherwise identified in subsections A through C, but who used the Trolley, acted on behalf of or for the benefit of the City of Deadwood, at the City's direction, and with the City's permission, and which fall within the same general class as those individuals or entities identified in subsections A through C, can be construed as "members" under the policy.  Docket No. 43, at p. 11.

required to fulfill the requirement of subsection B, she asserts that the $1 fee she paid to ride the Trolley constitutes an act in the interests of the City.  Id. at p. 10-11.  Finally, she states that if SDPAA had intended to specifically exclude Trolley passengers from coverage, it could have easily included a provision to that effect in the policy.  Id. at p. 13.

### a.    Purpose of the SDPAA Policy

Because the court must consider the disputed membership language in the broader context of the SDPAA agreement as a whole, an abbreviated discussion of the history and purpose of public entity insurance pools in the state of South Dakota is warranted.  In 1981, the South Dakota legislature enacted S.D.C.L. §§ 21-32-15 and 21-32-16, which authorized the state to purchase public liability insurance.  See Kyllo v. Panzer, 535 N.W.2d 896, 899 (S.D. 1995).  Pursuant to the original statutory scheme, the state waived sovereign immunity and consented to suit up to the limits of the liability insurance purchased by the state.  See S.D.C.L. § 21-32-16.

In 1983, the legislature enacted S.D.C.L. § 21-32-17,which expanded the scope of sovereign immunity, except as waived under S.D.C.L. § 21-32-16. This expansion broadened immunity to all officers, employees, or agents of the state, acting within the scope of their employment, whether or not they were performing ministerial or discretionary functions.  See S.D.C.L. § 21-32-17.

23

In 1985, the state's public liability insurance was cancelled.[6]  See Kyllo, 535 N.W.2d at 900.  Shortly thereafter, Governor William Janklow requested an opinion from the South Dakota Supreme Court as to the constitutionality of S.D.C.L. §§ 21-32-16 and 17.  In Re Request for Opinion of Supreme Court Relative to Constitutionality of S.D.C.L. 21-32-17, 379 N.W.2d. 822, 824 (S.D. 1985).  The South Dakota Supreme Court ultimately determined that S.D.C.L. § 21-32-17 was valid under the legislature's Article III powers, and that § 21-32-16 did not operate as a waiver of sovereign immunity, so long as the state established a self-insurance fund.  Id. at 825, 827.

Consequently, in 1986, the state legislature enacted S.D.C.L. Chapter 3-22, which established the required self-insurance fund, also known as the public entity pool for liability (PEPL).  Hansen v. South Dakota Dept. of Transportation, 1998 SD 109, ¶11, 584 N.W.2d 881, 883-84.  S.D.C.L. § 3-22-1 states, in part, that:

> The purpose of this program is to provide a fund as the sole source
> for payment of valid tort claims against all member public entities of
> the state and their officers and employees for all liability they may
> incur based upon negligence in the operation of motor vehicles or

---

[6]Through its representative, Public Entity Underwriters, Ltd., the state's insurer, Colonial Penn, notified the State Office of Executive Management, Bureau of Administration that the public liability insurance was cancelled, due to the "lack of availability of reinsurance."  In Re Request for Opinion of Supreme Court Relative to Constitutionality of S.D.C.L. 21-32-17, 379 N.W.2d. 822, 823 (S.D. 1985).

negligence in performing other acts within an employee's scope of employment.

<u>Hansen</u>, 1998 SD 109, ¶11, 584 N.W.2d at 883-84.  "It is presumed the fund was established as a substitute for traditional liability insurance."  <u>Kyllo</u>, 535 N.W.2d at 900.

    S.D.C.L. § 3-22-18 states that PEPL is a liability pool, rather than a form of insurance or an insurance company.  The purpose of the PEPL fund is to provide "the sole source for payment of valid tort claims against all member public entities of the state and their officers and employees for all liability they may incur based upon negligence in the operation of motor vehicles or negligence in performing other acts within an employee's scope of employment [.]"  S.D.C.L. § 3-22-1.  The PEPL fund provides no payment for "pain and suffering, inconvenience, physical impairment, disfigurement, loss of society and companionship, and hedonic damages," among other things.  <u>Kyllo</u>, 535 N.W.2d at 897; and <u>see</u> *Participation Agreement Between the Public Entity Pool for Liability and the State of South Dakota*, pp. 2-4, Jul. 1, 2010, <u>available at</u> <u>http://orm.sd.gov/RiskManual.aspx</u> (last visited May 18, 2011).

    Under the statutory scheme as it exists today, "unless a claim falls within PEPL fund coverage, the doctrine of sovereign immunity applies to abrogate that claim."  <u>Kyllo</u>, 535 N.W.2d at 900.  The decision in <u>In re Request for Advisory Opinion</u> held that PEPL does not qualify as liability insurance, which would waive sovereign immunity under S.D.C.L. § 21-32-16.  Therefore,

S.D.C.L. § 21-32-17 was enacted for the purpose of granting absolute and complete immunity to participants in the risk sharing pool.  <u>Kyllo</u>, 535 N.W.2d at 900, n.7.  In addition, under the 1991 amendment to S.D.C.L. § 21-32A-2, participation in the PEPL fund represents an effective waiver of sovereign immunity as a risk sharing pool.  <u>Id.</u>

The South Dakota Public Assurance Alliance (SDPAA) is simply another name for the PEPL fund.  <u>See</u> <u>South Dakota Public Entity Pool for Liability v. Winger</u>, 1997 SD 77, ¶2, 566 N.W.2d 125, 126.  The South Dakota Supreme Court has noted that the purpose of SDPAA is to provide "underinsured motorist coverage for employees injured in the scope of employment and while acting on behalf of or in the interest of their employers," in accordance with the stated purpose of the PEPL fund, as set forth in S.D.C.L. § 3-22-1.  <u>Id.</u>

In light of the history and purpose behind the PEPL fund, and upon a reading of Section II in conjunction with the entire policy, it is clear that passengers of City-owned or operated vehicles, who are not employees or agents of the City, were not intended to be covered by public entity risk-sharing pools like the SDPAA governmental liability coverage agreement at issue in this case.  The legislative history and the relevant statutes which created the PPEL fund do not discuss or even contemplate that private passengers on vehicles owned by public entities were intended to be members of the risk pool.  <u>See</u>

26

S.L. 1986, ch. 413, § 1; S.L. 1993, ch. 46, § 1; S.L. 2010, ch. 24, § 1.[7]  By

definition, these risk sharing pools were intended to provide a fund for tort

claims against public entities of the state and their officers and employees

based upon negligence in the operation of motor vehicles or other acts within

the scope of the member's employment.  S.D.C.L. § 3-22-1.  The risk pools were

not enacted for any purpose other than to provide liability insurance to public

entities and their employees, while acting in the scope of their employment.

South Dakota PEPL v. Winger, 1997 SD 77, ¶2, 566 N.W.2d at 126.  The

legislative intent and the purpose behind the statutes which created the risk

pool fund demonstrate that public entities, their officers, and their employees

are the intended members of the pool, and that passengers, including

Ms. Goddard, are not.

> **b.**   ***Ejusdem Generis***

Despite arguing that the insurance policy is clear and unambiguous as

to Ms. Goddard's ineligibility for membership (Docket No. 43, at p. 9), as this

court finds it is, SDPAA urges the court to apply the doctrine of *ejusdem*

*generis* to Section II of the policy to find that Goddard is not a member.  Docket

No. 43, at p. 10.  Ms. Goddard asserts that the policy language is not

---

[7]Interestingly, during the 2010 legislative session, S.D.C.L. § 3-22-1 was revised so as to eliminate all occurrences of the word "member," as it relates to those persons or entities which are insureds under the PEPL, in favor of the terms "state entity or employee."  See H.B. 1061, 85th Leg., 2010 Sess. (S.D. 2010); SL 2010, ch. 24, § 1.

ambiguous and clearly indicates that she is a member, so *ejusdem generis* is not applicable.  Docket No. 50, at p. 9-10.  She also states that SDPAA's argument that she must have been acting on behalf of or for the benefit of the City, at the City's directions and with the City's permission is misplaced, since the word "directions" does not appear anywhere in the SDPAA policy and because she qualifies as a member under Section II(D).  Docket No. 50, at p. 10-11.

Ejusdem generis is a canon of construction to be used where language is ambiguous.  See, e.g., Garcia v. United States, 469 U.S. 70, 74-45 (1984) (reaffirming prior holding that *ejusdem generis* is an instrumentality to be applied only where there is uncertainty); Tourdot v. Rockford Health Plans, Inc., 439 F.3d 351, 353 (7th Cir. 2006); Travelers Exp. Co., Inc. v. State of Minn., 506 F. Supp. 1379, 1386 (D. Minn. 1981)("The rule of *ejusdem generis* is an aid in construing ambiguous statutes.").  Where language is clear and unambiguous, the court need not look to canons of construction for interpretation.  Tourdot, 439 F.3d at 354 (stating that *ejusdem generis* is inapplicable where language has plain meaning).

Under the doctrine of *ejusdem generis*, "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  United States v. Stanko, 491 F.3d 408, 414 n.5 (8th

Cir. 2007) (quoting Circuit City Stores, Inc., v. Adams, 532 U.S. 105, 114-15
(2001)).  The doctrine applies to contracts as well as statutory language, and it
permits the inclusion of things not of the same class or kind if it appears the
parties so intended.  11 WILLISTON ON CONTRACTS, 32:10 (4th ed. 2010) (citations
omitted).

      Courts in the Eighth Circuit have applied the doctrine of *ejusdem generis*
in both civil and criminal cases, where specific words are followed by general
words in statutory texts or contracts.  See, e.g., Patterson v. Tenet Healthcare,
Inc., 113 F.3d 832, 836 (8th Cir. 1997) (applying doctrine to terms in
arbitration agreement); In re Eilbert, 162 F.3d 523, 527 (8th Cir. 1998)
(applying doctrine to "broad and generic" term "annuity" in bankruptcy
proceeding); Preferred Risk Mut. Ins. Co. v. United States, 86 F.3d 789, 794
(8th Cir. 1996) (applying doctrine to definition of "person" in the Lanham Act).
For example, in United States v. Auginash, the court held that under 18 U.S.C.
§ 81, which defines arson in part as the willful and malicious burning of "any
building, structure or vessel, any machinery or building materials or supplies,"
the burning of an automobile fell within the statute as "machinery."  United
States v. Auginash, 266 F.3d 781, 783-84 (8th Cir. 2001).  The plaintiff argued
that an automobile did not constitute "machinery," such that the burning of an
automobile did not fall within the statute.  The court relied on the plain and
ordinary meaning of "machinery" by looking to the dictionary definition of the

word.  Id. at 784.  The court held that the inclusion of automobiles as machinery supported the conclusion that the arson statute gave "sufficient notice that the burning of an automobile [was] encompassed within its terms to satisfy constitutional vagueness concerns."  Id. at 785 (citations omitted).

The federal case law notwithstanding, the substantive law of South Dakota applies to issues of statutory construction.  See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  In South Dakota, *ejusdem generis* has the same meaning and application as it does in federal law.  "[W]here general words follow the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general class as those enumerated."  In re Grievance of Wendell, 1998 SD 130, ¶ 7, 587 N.W.2d 595, 597 (quoting BLACK'S LAW DICTIONARY 517 (6th ed.1990)); see also In re Grievance of O'Neill, 347 N.W.2d 887, 889 (S.D. 1984), *appeal after remand*, O'Neill v. South Dakota Bd. of Charities and Corrections, 377 N.W.2d 587 (S.D.1985) (stating that the "*ejusdem generis* principle holds that where general words follow . . . the enumeration of particular classes of things, the general words will be construed as applying only to things of the same general kind as those enumerated.").  Consequently, whether one applies *ejusdem generis* under state or federal law to the facts of this case, the result is the same.

As the court noted above, the doctrine of *ejusdem generis* is a "fallback" instrumentality to be used where language is ambiguous, and if there are good

reasons not to apply it, it should not be applied.  Circuit City Stores, Inc., 532

U.S. at 138.  Because the court finds the SDPAA agreement is not ambiguous,

the court declines to apply *ejusdem generis*.  However, even if the disputed

language could be considered ambiguous, and if application of *ejusdem generis*

was therefore appropriate, such application would still dictate the result that

Ms. Goddard is not a member of the risk sharing agreement, as the following

discussion demonstrates.

Section II(A) indicates that a member is "***you***, including ***your*** governing

body, Boards, Commissions, or Councils."  Docket No. 44-1, at p. 8 (emphasis

in original).  This provision clearly indicates that a public entity of some kind,

and not a private individual, is the primary insured under the policy.  In this

case, "you" is the City of Deadwood.

Section II(B) extends membership to those persons or entities acting on

the behalf or in the interest of those persons and entities named in Section

II(A), to include members of the City's governing body, boards, commissions, or

councils; elected or appointed officials; City employees acting in the scope of

their employment; volunteers or students performing a service for the City, at

the City's request; and volunteer emergency services entities.  Id.  Section II(B)

contains an explicit exception for "any elected or appointed official, Board,

Commission or Council ***member***, employee or volunteer" who is using an

***automobile*** owned by that person, rather than by the City, unless that person

31

was "acting within the scope of their duties for [the City]."  Id. (emphasis in original).  Section II(C) includes as members "any organization" which the City acquires or forms, and over which the City maintains ownership or a majority ownership interest.  Id.  "[J]oint ventures" are excluded from coverage.  Id.

Section II(D) contains the language under which Ms. Goddard argues she is a member of the risk sharing pool.  This section includes as a member "anyone else" who uses, with the City's permission, any automobile owned, hired, or borrowed by the City.  Section II(D) excepts from coverage "the owner or anyone else from whom [the City] hire[s] or borrow[s]" the vehicle being used.  Id.

As indicated by its plain language, the entirety of Section II demonstrates that the class to be covered by the agreement are employees, agents, or entities of the City of Deadwood.  Section II(D) must be understood within its context as a part of both Section II and the governmental liability agreement as a whole, rather than as an all-encompassing provision extending membership to private persons who are not associated with the City's activities.  When considered in its proper context, it appears that Section II(D) was intended to be a catch-all provision at the end of a list of City entities or employees, or specifically-named classes of persons who acted for the benefit or in the interests of the City.  See Nielson v. AT & T Corp., 1999 SD 99, ¶¶ 8-16, 597 N.W.2d 434, 438-40 (holding that catch-all phrase "any other person" was limited to other persons

like the equine professionals and equine activity sponsors listed specifically in statute).  When the cannon of construction of *ejusdem generis* is applied to Section II, the court cannot conclude that Section II(D) provides membership in the PEPL fund to private citizens, like Ms. Goddard.

### c.   Collateral Estoppel

Ms. Goddard asserts that the state court's ruling in the case of Gloe v. City of Deadwood, Lawrence County, South Dakota, Civ. No. 09-991, collaterally estops SDPAA from now asserting that Goddard is not a member. Docket No. 50, at p. 8.  Ms. Goddard asserts that "judgment on a motion for summary judgment is just as binding as a judgment entered after a trial of the facts."  Docket No. 50, at 9 (citing Ruple v. City of Vermillion, 714 F.2d 860, 862 (8th Cir. 1983)).

Neither party indicates to the court the facts of Gloe v. City of Deadwood, but Ms. Goddard represents that the state court judge "ruled that passengers on the Deadwood Trolley are considered members under SDPAA's policy."  See Docket No. 50, at p. 2.  Gloe v. City of Deadwood involved plaintiff Cynthia Gloe.  Ms. Goddard was not a party to that action, but SDPAA was a named defendant in that case.  See Docket No. 54-1, at p. 2.

SDPAA does not take issue with Goddard's representation of the facts of the state case, or that the issue presented to the circuit court judge was whether Trolley passengers are members under the SDPAA agreement.

Instead, SDPAA argues that the circuit court judge's ruling was merely an interlocutory ruling pursuant to S.D.C.L. § 15-6-4(b),[8] so collateral estoppel does not apply.  Docket No. 55, at p. 4.

Under collateral estoppel, also known as issue preclusion, "once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  Allen v. McCurry, 449 U.S. 90, 94 (1980). Under 28 U.S.C. § 1738, the full faith and credit statute, the federal courts must "give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged."  Kremer v. Chem. Constr. Corp., 456 U.S. 461, 466 (1982); and see Marrese v. Am. Acad. of Orthopaedic Surgeons, 470 U.S. 373, 380 (1985)

---

[8]S.D.C.L. § 15-6-54(b) provides that:

When multiple claims for relief or multiple parties are involved in an action, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment.  In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

(according to the terms of the full faith and credit statute, the federal court should apply state preclusion law in its analysis).  Full faith and credit comprises the law of issue preclusion and "is not a jurisdictional matter." Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 293 (2005).

South Dakota law dictates that in order for collateral estoppel to apply, a four-part test must be satisfied:  (1) the issue decided in the prior adjudication is identical to the one presented in the action in question; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication; and (4) the party against whom the plea is asserted had a full and fair opportunity to litigate the issue in the prior adjudication.  Grand State Property, Inc. v. Woods, Fuller, et al., 1996 SD 139, ¶12, 556 N.W.2d 84, 87 (quoting Black Hills Novelty Co., Inc. v. South Dakota Commission on Gaming, 520 N.W.2d 70, 73 (S.D. 1994) (other internal citations omitted)).

Significantly, "[i]ssue preclusion only bars 'a point [that] was *actually and directly in issue* in a former action and was judicially passed upon and determined by a domestic court of competent jurisdiction.' " Link v. LSI, Inc., 2010 SD 103, ¶36, 793 N.W.2d 44, 55 (quoting American Family Ins. Group v. Robnik, 2010 SD 69, ¶18, 787 N.W.2d 768, 774–76) (additional citation omitted).  The case of Link v. LSI, Inc. is illustrative of this principle.  The Link case involved two state court actions, one brought in Wisconsin, and the other

brought in South Dakota.  2010 SD 103, ¶2, 793 N.W.2d at 46.  As part of the Wisconsin action, Jay Link ("Jay"), who was the defendant in that case, made breach of fiduciary duty counter claims against his father, Jack; his brother, Troy; two other LSI directors, Mermeier and Jarvela; and two directors in other Link companies.  Id.  After a three-phase trial, the jury in the Wisconsin action found that the four directors sued by Jay had not breached their fiduciary duties to Jay, but that Jack and Troy had.  Id. at ¶4, 793 N.W.2d at 47.

In the South Dakota action, Jay, now the plaintiff, made identical allegations of breach of fiduciary duties against Jack and Troy, and against two additional LSI directors, Smith and Walz, neither of whom were parties to the Wisconsin action.  Id. at ¶33, 793 N.W.2d at 53-54.  Defendant LSI argued that collateral estoppel prevented Jay from litigating his breach of fiduciary duties claims in South Dakota, since the allegations made against Smith and Walz were identical to those made against Jack, Troy, and the four directors of LSI who were sued in the Wisconsin action.  Id. at ¶35, 793 N.W.2d at 54-55.

The South Dakota court noted that the issue whether Smith and Walz breached their fiduciary duties was not litigated in the Wisconsin trial.  Id. at ¶36, 793 N.W.2d at 55.  Even though the claims asserted against the directors in the Wisconsin action were identical to those asserted against Smith and Walz in the South Dakota action, because Smith and Walz were not parties to the Wisconsin action, "the issue [whether Smith and Walz breached their

36

fiduciary duties[ could not have been actually and directly in issue in [the Wisconsin] action." Id.  Therefore, the South Dakota court held that Jay's claims against Smith and Walz were not barred by collateral estoppel in the South Dakota court.  Id.

In the state court case cited by Ms. Goddard, the circuit court judge denied SDPAA's motion for summary judgment and specifically found that the plaintiff, *Cynthia Gloe*, was a member under the SDPAA agreement.  See Docket No. 54-1, at 1-2.  The issue whether Ms. Goddard is a member under the SDPAA agreement was not litigated in the state court case.  Ms. Goddard was not a party in Gloe v. City of Deadwood, et al., so the issue of her membership could not have been "actually and directly in issue."  Link, 2010 SD 103, ¶36, 793 N.W.2d at 55.  Therefore, even if the facts which Ms. Goddard alleges entitle her to membership in the present action are identical to those which were asserted by Cynthia Gloe in the state court action, the issue of Ms. Goddard's membership was not actually and directly at issue in the state court case.  Therefore, collateral estoppel does not preclude SDPAA's litigation of the issue in the present action.

Furthermore, the factual circumstances of the state court case cited by Ms. Goddard indicate that the circuit court's ruling adjudicated "fewer than all the claims or the rights and liability of fewer than all the parties," and was therefore not a final ruling for purposes of later invoking collateral estoppel.

See S.D.C.L. § 15-6-54(b).  The court denied SDPAA's motion for summary judgment and permitted the case to proceed to trial.  The court specifically found that the plaintiff Cynthia Gloe was a member within the meaning of the SDPAA policy, but this ruling did not adjudicate all the claims, rights, and liability of all the parties.  See Docket No. 54-1.  On this additional basis, the court concludes that collateral estoppel does not apply to the present circumstances such that SDPAA is foreclosed from challenging the issue of Ms. Goddard's membership under the policy.

Based on the foregoing discussion of the history and purpose of South Dakota's risk pool fund, the doctrine of *ejusdem generis*, and collateral estoppel, the court finds that the SDPAA policy is not ambiguous, and respectfully recommends that SDPAA's motion for summary judgment as to whether Ms. Goddard is a member under the SDPAA policy be granted in SDPAA's favor.

### 3.   Whether the Plaintiff May Recover Under Both the Liability and the Uninsured Motorist Provisions

Because the court recommends that Ms. Goddard is not a member, the court recommends that she is not entitled to recover under the uninsured motorist provision.  However, in the event the district court declines to adopt this court's recommendation that Ms. Goddard is not a member, the court will consider SDPAA's final argument.  Specifically, SDPAA asserts that if Goddard is found to be a member, she may not recover under both the liability coverage

and the uninsured motorist provisions of the agreement, because such recoveries would be duplicative.  Docket No. 43, at p. 7.  In support of its argument, SDPAA points to Section VII(G), entitled "Duplication of Coverage Limits."  See Docket No. 44-1, at p. 18.  Section VII(G) states that "[n]o person may recover duplicate coverages for the same expenses or injury under this Agreement or any other agreement."  Id.  SDPAA asserts that the plain and ordinary meaning of the policy language, particularly the word "injury," demonstrates that Goddard may not obtain both liability and uninsured motorist coverage for her injury which arose out of the single event on August 25, 2007.  Docket No. 43, at p. 7.

Ms. Goddard asserts that her claims do not involve duplicate coverages, because, as a member of the agreement, she is entitled to full coverage under both the liability and the uninsured motorist provisions.  Docket No. 50, at p. 5-6.  Ms. Goddard asserts that she may recover on both claims because the two claims were brought pursuant to separate policy provisions against separate defendants.  First, she asserted a claim against the City, through the actions of its employee and member of the policy Jerry Boub, pursuant to the liability coverage provision in the policy.  This claim has now been settled.  Docket No. 72.  Second, she has asserted a claim against SDPAA with herself as the member.  She asserts her entitlement to recover for this second claim

pursuant to the underinsured/uninsured motorist provision, based on the actions of the alleged unidentified vehicle.

Ms. Goddard states that denial of her claim for uninsured motorist benefits would defeat the purpose of South Dakota's uninsured motorist statutes, which were intended to provide "the same insurance protection to the insured party who is injured by an uninsured . . . motorist that would have been available to him had he been injured as a result of the negligence of a motorist covered by the minimum amount of liability insurance." Docket No. 50, at p. 6 (quoting Clark v. Regent Ins. Co., 270 N.W.2d 26, 29 (S.D. 1978)). Ms. Goddard does not address whether the SDPAA agreement permits recovery under both the liability and uninsured motorist provisions for her damages, which resulted from the singular event.

Section VII(G) of the SDPAA agreement explicitly prohibits recovery of duplicative payments for a single expense or injury. See Docket No. 44-1, at p. 18 ("No person may recover duplicate coverages for the same expenses or injury under this Agreement or any other agreement."). SDPAA's argument appears to be that Ms. Goddard is attempting to impermissibly "stack" her recovery from her settlement with the City of Deadwood onto any prospective recovery from SDPAA. As the South Dakota Supreme Court explained in 2003, the term "stacking" has varying definitions in insurance law. See Phen v. Progressive Northern Ins. Co., 2003 SD 133, ¶9, 672 N.W.2d 52, 55. However,

40

the court's definition of stacking in the <u>Phen</u> case is equally applicable here.

Stacking

> arises where the same claimant and the same loss are covered under multiple policies, or under multiple coverages contained in a single policy, and the amount available under one policy is inadequate to satisfy the damages alleged or awarded. In essence, stacking describes the phenomenon of insureds or claimants against them adding all available policies together to create a greater pool in order to satisfy their actual loss.

<u>Phen</u>, 2003 SD 133, ¶9, 672 N.W.2d at 55 (quoting 12 Lee R. Russ & Thomas F. Segalla, <u>Couch on Insurance</u> § 169:4 (3d ed. 1999)).  Like the plaintiff in the <u>Phen</u> case, Ms. Goddard is attempting to collect coverage for the same claimant and the same loss, but is attempting to recover from multiple coverages in a single policy, rather than under multiple policies.  Therefore, the case involves the stacking of insurance claims.

The current version of S.D.C.L. § 58-11-9 provides that

> No policy insuring against loss resulting from liability imposed by law for bodily injury or death suffered by any person arising out of the ownership, maintenance, or use of a motor vehicle may be delivered or issued for delivery in this state with respect to any motor vehicle registered or principally garaged in this state, except for snowmobiles, unless coverage is provided therein or supplemental thereto in limits for bodily injury or death equal to the coverage provided by such policy for bodily injury and death, for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles and hit-and-run motor vehicles because of bodily injury, sickness, or disease, including death, resulting therefrom.  However, the coverage required by this section may not exceed the limits of one hundred thousand dollars because of bodily injury to or death of one person in any one accident and, subject to the limit for one person, three hundred thousand dollars because of bodily injury to or death of two or more

persons in any one accident, unless additional coverage is requested
by the insured.  Any policy insuring government owned vehicles may
not be required to provide uninsured motorist coverage.

Therefore, as an insurer of a public entity, SDPAA was not statutorily required
to provide uninsured motorist coverage in the governmental liability coverage
agreement.  However, its choice to do so was permissible, and the limits set
forth in S.D.C.L. § 58-11-9 apply to the uninsured motorist provision in the
SDPAA policy.  The South Dakota Supreme Court has held that "the maximum
amount set forth in [S.D.C.L. § 58-11-9] is sufficient to protect those insureds
who may be legally entitled to recover against an uninsured motorist."  Union
Insurance Co. v. Stanage, 454 N.W.2d 736, 739 (S.D. 1990).

Under South Dakota law, "an insured is allowed to stack insurance
policies up to the $100,000 statutory maximum unless the insured has
requested greater coverage.  However, the insured may not collect an amount
greater than his or her actual loss."  Phen, 2003 SD 133, ¶15, 672 N.W.2d at
57; Westphal v. Amco Ins. Co. , 209 N.W.2d at 558-559 (S.D. 1973); Union Ins.
Co. v. Stanage, 454 N.W.2d 736, 739 (S.D. 1990); Nickerson v. American States
Ins., 2000 SD 121, ¶18, 616 N.W.2d 468, 473, n.5.

The fact that Ms. Goddard's previous claim against the City has now
been settled is of particular significance to the dispute over whether
Ms. Goddard is now attempting to achieve duplicative recovery.  See Docket No.
72.  The court has no information as to the amount paid to Goddard under the

42

settlement, nor the source from which the City has paid Ms. Goddard.  In addition, the court has no information as to the extent of Ms. Goddard's injuries or the amount of her damages.  Without this information, the court cannot determine whether Ms. Goddard has been fully or partially compensated for her injuries which arose from the August 25, 2007, accident.  If the settlement with the City fully compensated Ms. Goddard for her injuries, she may not recover an amount greater than her actual loss under any policy.  Phen, 2003 SD 133, ¶15, 672 N.W.2d at 57.  Without knowing the extent of Ms. Goddard's recovery to date, the court cannot determine whether any recovery from SDPAA can be deemed duplicative.

As stated earlier, the court recommends granting SDPAA's motion for summary judgment on the issue of whether Ms. Goddard is entitled to duplicate coverage because the court concludes she was never intended to be a "member" under the policy.  However, if the district court concludes that Ms. Goddard is a "member" under the policy, then based on the immediately foregoing analysis, the court recommends that SDPAA's motion for summary judgment on the issue of whether Ms. Goddard is entitled to duplicate coverages under the policy be denied, because the court has insufficient information to determine whether any prospective recovery from SDPAA, if Goddard is deemed to be a member under the SDPAA agreement, would permit

Goddard to recover an amount greater than either her actual loss, or an amount in excess of the $100,000 statutory limit under S.D.C.L. § 58-11-9.

## C.   PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DOCKET NO. 56]

### 1.   Whether Ms. Goddard Was Negligent

Because the court has concluded that SDPAA's motion for summary judgment should be granted in its entirety, and because Ms. Goddard has settled her claims against the city of Deadwood, Ms. Goddard's motion for partial summary judgment is rendered moot.  However, in the interests of providing a complete record, the court addresses that motion on its merits in the event the district court determines not to adopt this court's recommendation that summary judgment should be entered in SDPAA's favor.

The parties do not dispute that there has been no claim by SDPAA that Ms. Goddard was contributorily negligent or that she assumed the risk when she rode on the Trolley on August 25, 2007.  See Docket No. 58, at ¶ 7; Docket No. 62, at p. 3.  To prevail on a motion for summary judgment, the moving party must establish the absence of any material fact, and demonstrate that she is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a). In order to survive summary judgment, the nonmoving party must then set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists.  Anderson, 477 U.S. at 256.  SDPAA has not disputed that it has

44

not made any claim that Ms. Goddard was negligent under either a theory of contributory negligence or assumption of the risk.  Therefore, and based on the undisputed facts, the court recommends that Ms. Goddard's motion be granted as to the issue that the plaintiff, Ms. Goddard, is not liable for the Trolley accident.

2.      **Whether the Plaintiff was Injured as a Result of the Accident and Has Received Medical Treatment for Her Injuries**

The parties do not dispute that Ms. Goddard was injured as a result of the Trolley accident on August 25, 2007.  See Docket No. 58, at ¶¶ 4-5; Docket No. 62, at p.2.  Similarly, there is no dispute that, subsequent to the accident, Ms. Goddard received medical treatment for her injuries.  The only dispute appears to be the extent of Ms. Goddard's injuries and the subsequent treatment she received.  Therefore, and based on the undisputed facts before the court, the court recommends that Ms. Goddard's motion for partial summary judgment as to (1)the fact that Ms. Goddard sustained injuries as a result of the Trolley accident, and (2) that she subsequently received medical care for those injuries, be granted.  The extent of those injuries and the amount of resultant medical care occasioned by those injuries is for the jury to decide.

45

## CONCLUSION

Based on the foregoing, the court respectfully recommends that:

1.     SDPAA's motion for summary judgment [Docket No. 41] be granted

in SDPAA's favor because the court concludes that Ms. Goddard is

not a "member" as a matter of law under the SDPAA policy.

2.     Ms. Goddard's motion for partial summary judgment [Docket No.

56] be denied as moot.

## NOTICE OF RIGHT TO APPEAL

The parties have fourteen (14) days after service of this report and

recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B),

unless an extension of time for good cause is obtained.  See FED. R. CIV. P.

72(b)(2).  A party may respond to another party's objections within 14 days of

being served with a copy.  Id.  Failure to file timely objections will result in the

waiver of the right to appeal questions of fact.  Id.  Objections must be timely

and specific in order to require *de novo* review by the District Court.  Thompson

v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir.

1986).

Dated June 3, 2011.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE

46